UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

VALERIE GRAY,                          )      CASE NO. 1:16CV1328
                                       )
            Plaintiff,                 )      MAGISTRATE JUDGE
                                       )      GEORGE J. LIMBERT
      v.                               )
                                       )
NANCY BERRYHILL[1],                    )
COMMISSIONER OF SOCIAL                 )      MEMORANDUM OPINION & ORDER
SECURITY ADMINISTRATION,               )
                                       )
            Defendant.                 )

      Plaintiff Valerie Gray ("Plaintiff"), requests judicial review of the final decision of the
Commissioner of Social Security Administration ("Defendant") denying her application for
disability insurance benefits ("DIB"). ECF Dkt. #1. In her brief on the merits, filed on September
10, 2016, Plaintiff asserts that the administrative law judge ("ALJ") failed to properly evaluate the
opinions of her treating physicians and her specialized nurse as to her physical and mental functional
limitations. ECF Dkt. #13. On November 9, 2016, Defendant filed a brief on the merits. ECF Dkt.
#15. Plaintiff did not file a reply brief.

      For the following reasons, the Court AFFIRMS the ALJ's decision and DISMISSES
Plaintiff's complaint in its entirety WITH PREJUDICE.

## I.      FACTUAL AND PROCEDURAL HISTORY

      On September 3, 2012, Plaintiff filed an application for DIB alleging disability beginning
October 5, 2010 due to bipolar disorder and deteriorated discs in her back. ECF Dkt. #10 at 69.
139-140, 166.[2] Plaintiff's application was denied initially and upon reconsideration. *Id.* at 100-108.

---

[1]On January 23, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security,
replacing Carolyn W. Colvin.

[2]All citations to the transcript refer to the page numbers assigned when the transcript was filed in the
CM/ECF system rather than the page numbers assigned when the transcript was compiled. This allows the
Court and the parties to easily reference the transcript as the page numbers of the .PDF file containing the
transcript correspond to the page numbers assigned when the transcript was filed in the CM/ECF system.

Following the denial of her application, Plaintiff requested an administrative hearing, and on November 12, 2014, an ALJ conducted an administrative hearing and accepted the testimony of Plaintiff, who was represented by counsel, and a vocational expert ("VE"). *Id.* at 34. On December 18, 2014, the ALJ issued a decision denying Plaintiff's application for DIB. *Id*. at 18-29. Plaintiff requested a review of the hearing decision, and on January 28, 2016, the Appeals Council denied review. *Id.* at 1-13.

On June 2, 2016, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. Plaintiff filed a brief on the merits on September 10, 2016. ECF Dkt. #13. On November 9, 2016, Defendant filed a merits brief. ECK Dkt. #15. Plaintiff did not file a reply brief. On August 12, 2016, the parties consented to the jurisdiction of the undersigned. ECF Dkt. #12.

## II. **ALJ'S DECISION**

In her decision, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2016. ECF Dkt. #10 at 18. She further found that Plaintiff had not engaged in substantial gainful activity since October 5, 2010, her alleged onset date. *Id*. at 20.

The ALJ noted that on October 5, 2010, Plaintiff bent down to pick up a jar of jelly while at work and developed sharp back pain. ECF Dkt. #10 at 23. She indicated that Plaintiff thereafter began experiencing constant pain and stiffness in her lower back, which extended to her legs. *Id*. The ALJ detailed imaging in the record which showed disc narrowing at L2-L3, and a MRI in February 2011 that showed disc herniation at L2-3, L3-4 and L4-5. *Id*. The ALJ also indicated that Plaintiff participated in physical therapy. *Id*.

The ALJ found that Plaintiff had the severe impairments of degenerative disc disease ("DDD") and affective disorders (bipolar and depression). ECF Dkt. #10 at 20. She further found that these impairments, individually or in combination, did not meet or equal any of the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"). *Id*. at 20-22. The ALJ thereafter determined that Plaintiff had the residual functional capacity ("RFC") to perform light work with the following limitations: she can never climb ladders, ropes or scaffolds; she can only occasionally climb ramps and stairs; she can occasionally stoop, crawl, kneel, and crouch; she has unlimited balancing ability; she has no memory limitations; she can perform work limited to

interacting with the general public, co-workers and supervisors for the basic purpose of accepting instructions, asking questions, and carrying out instructions by speaking, serving, and signaling, with no higher or more complex form of interaction such as mentoring, persuading, or working in a collaborative environment to achieve a task; and she is limited to work that is routine in nature with infrequent changes and no piece-rate type work. *Id*. at 22.

In addressing Plaintiff's physical limitations in her decision, the ALJ first considered the opinions of the state agency physicians, who had opined that Plaintiff could perform light work with limitations, including a need to shift positions after sitting or standing for thirty minutes. ECF Dkt. #10 at 25. The ALJ found that the state agency physicians' opinions were similar to her findings, except she rejected their opinions that Plaintiff needed to shift positions after sitting or standing for thirty minutes. *Id.* The ALJ reasoned that this restriction was inconsistent with the record because a recent examination showed that Plaintiff had a normal gait and full range of motion and no treatment notes indicated that Plaintiff sat uncomfortably during the examinations. *Id*. The ALJ also found that such a limitation was inconsistent with Plaintiff's daily living activities of cleaning, grocery shopping, and driving a car. *Id*.

The ALJ then considered the opinion of Dr. Patel, Plaintiff's treating physician, and she attributed little weight to his June 3, 2011 finding that Plaintiff was limited to lifting no more than ten pounds. ECF Dkt. #10 at 229. The ALJ explained that Dr. Patel stated this limitation in 2011, but more recent evidence, such as the report of agency consultative examiner Dr. Bradford, showed that Plaintiff had a full range of motion and strength in her neck, spine, and extremities, which suggested greater functional ability than previously found by Dr. Patel. *Id.* at 25. While she relied upon Dr. Bradford's examination findings to attribute less weight to Dr. Patel's lifting restriction, the ALJ went on to attribute only some weight to the rest of Dr. Bradford's opinion, specifically finding that her opinion that Plaintiff could not sit and stand more than thirty minutes at a time without a break was "generally inconsistent with the record" and was based upon Plaintiff's subjective reports despite objective medical evidence showing greater functional ability. *Id*.

As to Plaintiff's mental health limitations, the ALJ again addressed the opinions and findings of nontreating medical sources first. ECF Dkt. #10 at 25. She attributed some weight to the agency

examiners who opined that Plaintiff could perform simple and some complex tasks with additional limitations. *Id.* at 25-26. The ALJ then addressed the medical source statements of Plaintiff's treatment providers, Dr. Sheila Paul and Specialized Nurse Kathleen Christy, who diagnosed Plaintiff with major depressive affective disorder and opined on May 22, 2013 that Plaintiff could rarely: maintain attention and concentration for extended periods of two-hour segments; respond appropriately to change in routine settings; rarely deal with the public; function independently without redirection; work in coordination with or proximity to others without being distracted or being distracting; deal with work stress; complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; or understand, remember and execute complex or detailed job instructions. *Id.* at 322-323. On September 30, 2014, Nurse Christy completed another medical source statement indicating the same rare activities as those on May 22, 2013, except that she also opined that Plaintiff could rarely interact with supervisors or manage funds/schedules. *Id.* at 481-482.

The ALJ considered the medical source statements of these providers and she gave them little weight, finding them inconsistent with the medical records documenting that Plaintiff had a mental state within normal limits. ECF Dkt. #10 at 26. The ALJ also found that the medical source statements were inconsistent with the opinions of the state agency physicians and inconsistent with Plaintiff's reported activities of driving and managing her finances. *Id.* The ALJ also gave no weight to the opinions of Plaintiff's counselors who noted that Plaintiff was "markedly ill" in their treatment notes. *Id.* The ALJ explained that such a finding was inconsistent with the counselors' findings that Plaintiff's mood, affect, perception, content and appearance were within normal limits. *Id.* The ALJ also noted that the treatment notes seemed to check "markedly ill" regardless of the content of the treatment notes indicating that Plaintiff's mental status seemed within normal limits. *Id.*

The ALJ went on to find that the RFC she determined for Plaintiff, she could perform her past relevant work as a cashier. ECF Dkt. #10 at 26-17. The ALJ alternatively indicated that there were a significant number of jobs existing in the national economy that Plaintiff could perform with

-4-

the RFC that she determined. *Id*. The ALJ therefore found that Plaintiff was not under a disability as defined in the Social Security Act from October 5, 2010, through the date of her decision. *Id*.

## III.   STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1.   An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.   An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.   If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.   If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.   If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV.   STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## V.     LAW AND ANALYSIS

### A.     Law on Opinions of Treating[3] and Agency Examining Physicians

An ALJ must give controlling weight to the opinion of a treating source if the ALJ finds that the opinion is well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with the other substantial evidence in the record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ decides to discount or reject a treating physician's opinion, she must provide "good reasons" for doing so. Social Security Rule ("SSR") 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how her case is determined, especially when she knows that her treating physician has deemed her disabled and she may therefore "be bewildered when told by

---

[3] The Court notes that the SSA has changed the treating physician rule effective March 27, 2017. The SSA will no longer give any specific evidentiary weight to medical opinions, including affording controlling weight to medical opinions. Rather, the SSA will consider the persuasiveness of medical opinions using the factors specified in their rules and will consider the supportability and consistency factors as the most important factors.

an administrative bureaucracy that [s]he is not, unless some reason for the agency's decision is supplied." *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he or she rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243 (citing *Wilson*, 378 F.3d at 544).

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. 2010). The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. 2011) (quoting *Rogers*, 486 F.3d at 243 ). However, an ALJ need not discuss every piece of evidence in the administrative record so long as he or she considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence. *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004). Substantial evidence can be "less than a preponderance," but must be adequate for a reasonable mind to accept the ALJ's conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citation omitted).

If an ALJ declines to give controlling weight to the opinion of a treating source, she must determine the weight to give that opinion based upon a number of regulatory factors. 20 C.F.R. § 404.1527(c)(2). Such factors include "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source."

*Wilson*, 378 F.3d at 544, citing 20 C.F.R. § 404.1527(c). An ALJ is not required to discuss every factor in 20 C.F.R. § 404.1527(c).

In addition, more weight is attributed to the opinions of examining medical sources than to the opinions of non-examining medical sources. *See* 20 C.F.R. § 416.927(d)(1). However, an ALJ can attribute significant weight to the opinions of a nonexamining state agency medical expert in some circumstances because nonexamining sources are viewed "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." SSR 96–6p, 1996 WL 374180. The regulations require that "[u]nless the treating physician's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do work for us." 20 C.F.R. § 416.927(f)(2)(ii). Moreover, an ALJ is not required to explain why he favored one examining opinion over another as the "good reasons" rule requiring an ALJ to explain the weight afforded a treating physician's opinion does not apply. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.Appx. 496, 508 (6th Cir. 2006).

### B. Opinions of Drs. Patel, Bradford, Manos and Torello

Plaintiff first asserts that substantial evidence does not support the reasons that the ALJ gave for affording less than controlling weight to the opinion of Dr. Patel, Plaintiff's treating physician, who limited Plaintiff to lifting no more than ten pounds. ECF Dkt. #13 at 8. Plaintiff additionally contends that the ALJ wrongfully rejected the opinions of the agency physicians, Drs. Bradford, Manos, and Torello. *Id.* at 10-11.

### 1. Dr. Patel's Lifting Restriction

Dr. Patel's first examination and treatment of Plaintiff occurred on October 22, 2010, and he sent a letter dated October 25, 2010 indicating that Plaintiff suffered a workplace injury after picking up a jar of jelly and developing sharp pain in her back. ECF Dkt. #10 at 469. He noted that Plaintiff had significant pain upon palpation in the lumbosacral region, with muscle spasm at L1 to S1, limited range of motion in the lower back, and difficulty heel-toe walking. *Id.* at 226-227. Dr.

Patel ordered five weeks of physical therapy, prescribed medications, and opined that Plaintiff could not return to her work as a dietary aide until her condition stabilized since the position required frequent bending and lifting. *Id.* at 227.

On October 25, 2010, Plaintiff presented to Dr. Patel for her complaint of low back pain. ECF Dkt. #10 at 467. She complained that the back pain was increasing and at times, extended into her hips, buttocks and thighs. *Id.* She also complained that she had episodes of paresthesia in her legs and weakness in her legs as well, and she had significant difficulty with walking, standing, bending, and lifting for an extended period of time. *Id.* Upon examination, Dr. Patel noted persistent spasm and tenderness of the lumbar spine and restricted range of motion with flexion and extension, and positive straight-leg raising and femoral stretch test. *Id.* He diagnosed Plaintiff with lumbar region sprain, prescribed Zanaflex, gave Plaintiff a Biofreeze sample, and ordered follow-up in 4 days. *Id.* at 467-468.

An October 29, 2010 office visit note from Dr. Patel indicates that Plaintiff presented with recurring low back pain that was sharp and burning and that extended to Plaintiff's legs. ECF Dkt. #10 at 465. She complained that she had difficulty bending and lifting and she was unable to walk for long periods of time. *Id.* Upon examination, Dr. Patel noted tenderness in the lumbar spine, paraspinal musculature and sacroiliac joints, with restricted mobility and pain with flexion and extension, and positive straight-leg raising. *Id.* He diagnosed Plaintiff with lumbar region sprain, gave her samples of Zanaflex and Biofreeze, ordered a MRI, and ordered her to follow-up in 1 week. *Id.* at 465-466.

Dr. Patel's November 5, 2010 office visit note indicates that Plaintiff presented with moderate recurring low back pain with occasional radiating pain and leg paresthesias that increased when walking or standing. ECF Dkt. #10 at 463. Dr. Patel noted upon examination that Plaintiff had tenderness in her lumbar spine and paraspinals, paraspinal muscle spasms, and restricted range of motion with flexion and extension. *Id.* He diagnosed Plaintiff with lumbar region sprain, prescribed Zanaflex, gave Plaintiff a Biofreeze sample and home exercises, and ordered follow-up in 2 weeks. *Id.* at 463-464.

A November 7, 2010 office visit note from Dr. Patel indicates that Plaintiff presented with recurring low back pain with episodes of numbness and tingling and significant difficulties in walking, standing, climbing or descending stairs. ECF Dkt. #10 at 461. Upon examination, Dr. Patel noted mild to moderate tenderness in the low back and paraspinal muscles, vertebral tenderness, and tenderness over both sciatic notches with restricted range of motion with flexion and extension. *Id.* He diagnosed Plaintiff with lumbar region sprain, prescribed Zanaflex, gave Plaintiff a Biofreeze sample, and ordered a thoracic MRI and follow-up in 3 weeks. *Id.* at 461-462.

Dr. Patel's December 8, 2010 office visit note indicates that Plaintiff presented with low back pain with recurring sharp pain with some throbbing and pain extending into her hips and buttocks. ECF Dkt. #10 at 459. She complained that bending and lifting, as well as prolonged sitting increased her symptoms and her symptoms were worst in the morning. *Id.* Upon examination, Dr. Patel noted tenderness in the lumbar spine into the buttocks and sciatic notch with radiating pain, paraspinal muscle spasms, restricted range of motion with flexion and extension, and heel-toe walking impairment. *Id.* He diagnosed Plaintiff with lumbar region sprain, prescribed Zanaflex, gave Plaintiff a Biofreeze sample, and ordered follow-up in 3 weeks. *Id.* at 460-461.

A December 29, 2010 office visit note from Dr. Patel indicates that Plaintiff presented with recurring low back pain with some extension into her hips and thighs and difficulty with activities such as bending and lifting. ECF Dkt. #10 at 457. She complained that she could not walk or stand for extended periods of time and climbing or descending stairs caused increased pain. *Id.* Upon examination, Dr. Patel noted tenderness in the lumbar spine into the buttocks and sciatic notch with radiating pain, paraspinal muscle spasms, restricted range of motion with flexion and extension, and heel-toe walking impairment. *Id.* He diagnosed Plaintiff with lumbar region sprain, prescribed Naproxen and Zanaflex, and ordered follow-up in 3 weeks. *Id.* at 448-449.

A January 19, 2011 office visit note from Dr. Patel indicates that Plaintiff presented with low back pain that was migratory and intermittent, but more frequent, with significant morning stiffness and episodes of paresthesia in the legs. ECF Dkt. #10 at 453. Upon examination, Dr. Patel noted tenderness in the lumbar spine, with spasm, restricted mobility and pain with flexion and extension, and positive straight leg raising. *Id.* He diagnosed Plaintiff with lumbar region sprain, prescribed

Naproxen and Zanaflex, gave Plaintiff a sample of Biofreeze and home exercises, and ordered follow-up in 3 weeks. *Id*. at 453-454.

Dr. Patel's February 7, 2011 office visit note indicates that Plaintiff presented with significant back pain extending to both buttocks that was aggravated with activities such as bending or lifting. ECF Dkt. #10 at 451. Upon examination, Dr. Patel noted significant pain with palpation, muscle spasm over the paraspinal muscles, restricted range of motion and painful kneel-squat and toe walking. *Id.* He diagnosed Plaintiff with lumbar region sprain, prescribed Naproxen, Zanaflex, Medrol Dosepak, and gave her a sample of Biofreeze. *Id.* He ordered physical therapy and follow-up in 1 week. *Id*. at 452.

A February 2, 2011 MRI report indicated that Plaintiff had disc herniations at L2-3, L3-4, and L4-5. ECF Dkt. #10 at 223-224.

In a February 11, 2011 letter, Dr. Patel indicated that the lumbar spine MRI he ordered on February 1, 2011 showed that Plaintiff had disc herniations at L2-L3, L3-L4 and L4-L5 that did not exist prior to her injury at work and the herniations were therefore causally related to her workplace injury. ECF Dkt. #10 at 450.

A February 14, 2011 office visit note from Dr. Patel indicates that Plaintiff presented with low back pain that was not as severe when she was on the Medrol Dose pack but it was now recurring and variable in nature and degree with some radiation into her extremities. ECF Dkt. #10 at 448. Upon examination, Dr. Patel noted tenderness in the lumbar spine, paraspinal muscles and sacroiliac joints, restricted mobility and pain with flexion and extension, and positive straight leg raising. *Id.* He diagnosed Plaintiff with lumbar region sprain, prescribed Naproxen and Zanaflex, and ordered physical therapy and follow-up in 2 weeks. *Id*. at 448-449.

A February 28, 2011 office visit note from Dr. Patel indicates that Plaintiff presented with low back pain that was moderate in severity and she reported some difficulty with walking, standing, climbing or descending stairs with occasional pain extending to her legs. ECF Dkt. #10 at 446. Upon examination, Dr. Patel noted tenderness in the lumbar spine, spasm in the paralumbar muscles, restricted range of motion and extension, and positive straight leg raising. *Id.* He diagnosed Plaintiff

with lumbar region sprain, prescribed Naproxen and Zanaflex, and he recommended lumbar spine and other exercises and follow-up in 2 weeks. *Id*. at 440-441.

Dr. Patel's March 14, 2011 office visit note indicates that Plaintiff presented with low back pain migrating in nature with more frequency and she reported that she had significant morning stiffness, episodes of paresthesia in her legs, and increased pain depending upon activities. ECF Dkt. #10 at 444. Upon examination, Dr. Patel noted tenderness in the lumbar spine, moderate spasm in the paraspinal muscles bilaterally, pain with palpation, restricted range of motion and extension, difficulty heel-toe walking, and positive straight leg raising. *Id*. He diagnosed Plaintiff with lumbar region sprain, prescribed Naproxen and Zanaflex, and he recommended lumbar spine and other exercises and follow-up in 2 weeks. *Id*. at 440-441.

A March 21, 2011 office visit note from Dr. Patel indicates that Plaintiff presented with low back pain and she reported that she had lost her balance and her pain had increased, with sharp, burning pain extending to her hips and thighs, with increased pain when bending, lifting, walking or standing. ECF Dkt. #10 at 442. Upon examination, Dr. Patel noted tenderness in the lumbar spine, moderate spasm in the paraspinal muscles bilaterally, pain with palpation, restricted range of motion and extension, difficulty heel-toe walking, and positive straight leg raising. *Id*. He diagnosed Plaintiff with lumbar region sprain, prescribed a Medrol Dose pack and Cymbalta, and he reviewed a physical therapy report and recommended additional therapy, pain management, and follow-up in 1 week. *Id*. at 440-441.

An April 4, 2011 office visit note from Dr. Patel indicates that Plaintiff presented with low back pain that varied with activities with significant morning stiffness and paresthesia in the legs. ECF Dkt. #10 at 440. Upon examination, Dr. Patel noted tenderness in the lumbar spine, moderate spasm in the paraspinal muscles bilaterally, pain with palpation, restricted range of motion and extension, and difficulty in kneeling and squatting. *Id*. He diagnosed Plaintiff with lumbar region sprain, prescribed Cymbalta and Flexeril, and he recommended physical therapy, pain management, and follow-up in 4 weeks. *Id*. at 440-441.

A May 4, 2011 note from Dr. Patel indicates that Plaintiff presented complaining of low back pain. ECF Dkt. #10 at 438. Upon examination, Dr. Patel noted moderate spasm in the paraspinal

muscles bilaterally, pain with palpation, restricted range of motion and extension, and difficulty in kneeling and squatting. *Id.* He diagnosed Plaintiff with lumbar region sprain, prescribed Cymbalta and Flexeril, and he recommended lumbar spine and other exercises and follow-up in 4 weeks. *Id.* at 438-439.

The final record of Dr. Patel is a June 3, 2011 letter to 1-888-OhioComp detailing his June 1, 2011 office visit with Plaintiff in which she complained of moderate lumbar pain with activity and mild pain at rest, with morning stiffness and occasional radiating pain into her buttocks and thighs. ECF Dkt. #10 at 228. His examination showed tenderness and spasm, with restricted mobility and normal range of motion but pain with extreme range of motion. *Id.* He diagnosed sprain in the lumbar region, prescribed medications, and indicated that she could return to work, but was limited to lifting up to 10 pounds. *Id.* at 228-229.

The ALJ acknowledged this lifting restriction in her decision and she attributed less than controlling weight and in fact only little weight to this limitation by Dr. Patel. ECF Dkt. #10 at 25. The ALJ explained that Dr. Patel formed this opinion in 2011 and more recent record evidence showed that Plaintiff had more functional ability than the limitation, which made Dr. Patel's opinion less persuasive. *Id.* The ALJ cited to Exhibit B6F/6 in the record as support, which is agency examining physician Dr. Bradford's opinion dated April 3, 2013. *Id.*, citing ECF Dkt. #10 at 319-321. Dr. Bradford examined Plaintiff for her complaints of lower back pain and stiffness with pain and numbness radiating into her legs. *Id.* at 318. Dr. Bradford noted upon examination that Plaintiff had a normal station and normal posture, a normal gait, full, painless range of motion in the neck, extremities and spine, and normal strength and tone in the neck, extremities and spine as well. *Id.* at 319-320. Dr. Bradford opined that Plaintiff should be restricted to lifting no more than 20 pounds and standing or sitting for no more than 30 minutes at a time without a break. *Id.* at 321

The Court finds that the ALJ has sufficiently evaluated and articulated her reason for attributing less than controlling weight and indeed only little weight to Dr. Patel's lifting restriction. The ALJ reasonably explained that Dr. Patel's lifting restriction was formed in 2011 and other substantial evidence in the record after 2011 showed that Plaintiff's condition continued to improve. The record contains no other or more recent notes or opinions from Dr. Patel and no other evidence

-13-

establishes that Dr. Patel's lifting restriction was a permanent restriction or that Plaintiff continued to seek treatment for her back condition or had this lifting restriction beyond 2011. Moreover, Dr. Bradford's examination showed that Plaintiff had normal muscle testing results, no muscle spasms, and normal cervical, shoulder, lumbar, hip, knee and ankle ranges of motion. *Id*. at 313. She had ordered a lumbar spine MRI which showed moderately severe degenerative disc at L2-L3, with some anterior spurring and sclerosis of the inferior endplate of L2, and some straightening of the lumbar lordosis that could be related to muscular spasm and pain. *Id*. at 313. On the basis of the MRI and her physical examination, Dr. Bradford opined that Plaintiff had chronic low back pain due to lumbar disc disease and she was restricted to lifting no more than 20 pounds. *Id.* at 321. The agency reviewing physicians also opined that Plaintiff could lift up to twenty pounds. *Id*. at 78, 92. Thus, substantial evidence supports the ALJ's decision to attribute less than controlling weight and only little weight to Dr. Patel's lifting restriction and the ALJ reasonably considered the more recent medical evidence by Dr. Bradford showing that Plaintiff was not restricted to lifting only 10 pounds.

## 2. Shifting/Break Restriction by Drs. Bradford, Manos, and Torello

Plaintiff also challenges the ALJ's decision to reject the similar restrictions opined by Drs. Bradford, Manos and Torello concerning Plaintiff either shifting positions or taking a break every 30 minutes after sitting or standing. ECF Dkt. #13 at 10-14.

As indicated above, the ALJ accepted Dr. Bradford's April 3, 2013 opinion concerning Plaintiff's lifting restriction of up to 20 pounds. ECF Dkt. #10 at 25. However, the ALJ gave only some weight to Dr. Bradford's opinion, rejecting her additional limitation that Plaintiff could not sit or stand for more than 30 minutes without a break. *Id.* As to state reviewing physicians Drs. Manos and Torello, they opined on April 8, 2013 and July 9, 2013 respectively, that Plaintiff could lift no more than 20 pounds and she should not sit or stand for more than 30 minutes without being able to shift in her seat. *Id.* at 78, 92. The ALJ rejected the opinions of Drs. Manos and Torello concerning the shifting of position every 30 minutes. *Id*. at 25.

In rejecting the agency reviewing physicians' opinions concerning shifting, the ALJ found that such restrictions were vague and inconsistent with the record. ECF Dkt. #10 at 25. She relied upon Dr. Bradford's examination findings that Plaintiff had a normal gait, and full ranges of motion

and strength in the neck, spine, and upper and lower extremities.  *Id*. at 25, citing ECF Dkt. #10 at 319-321.  The ALJ further noted that Plaintiff's reported daily living activities suggested a greater functional ability as she reported that she was able to clean, grocery shop, and drive a car.  ECF Dkt. #10 at 25.

While the Court rejects the ALJ's reliance upon Plaintiff's limited daily activities as a reason to discount the reviewing and examining physicians' 30-minute shifting position or break limitations, the Court finds that the ALJ's reliance upon Dr. Bradford's normal physical examination findings was reasonable in rejecting those limitations.  The Court notes that Dr. Patel did not provide such a limitation as Plaintiff's treating physician, even early on after she sustained her injury.  Moreover, Dr. Patel's records only cover from the date when Plaintiff first sustained her back injury through June 2, 2011.  ECF Dkt. #10 at 436-470.  Dr. Bradford's examination occurred nearly two years after Plaintiff sustained the injury and underwent treatment.  *Id.* at 314-321.  Dr. Bradford's physical examination revealed normal findings and therefore provided no basis upon which she or the agency reviewing physicians could rely in opining a shifting position or break limitation for Plaintiff.  Accordingly, the ALJ properly considered Dr. Bradford's physical examination findings to reject her 30-minute break limitation for Plaintiff and to reject the shifting position limitation opined by Drs. Manos and Torello.

### C.      Opinions of Dr. Paul and Specialized Nurse Christy

The ALJ also attributed only little weight to the opinions of Dr. Paul, Plaintiff's treating psychiatrist, and Specialized Nurse Christy.  ECF Dkt. #10 at 26.  The medical records show that Plaintiff began mental health treatment in March of 2004 with Pathways as a readmission for services for bipolar disorder. *Id.* at 261.  Psychiatric notes by Nurse Lieder from Pathways in 2006 indicated that Plaintiff was out of her medications and was agitated and frustrated.  *Id.* at 212-213.  She was prescribed Lamictal. *Id.* at 213.  The notes of Nurse Krause from Pathways in May of 2008 indicated that Plaintiff had quit her job at Sam's Club because she had a fight with a customer.  *Id*. at 216.  Plaintiff's mood seemed better, she had no racing thoughts, and her mental status was reported as within normal limits.  *Id.*  Ms. Lieder's notes from September 2008 indicated that Plaintiff was sleeping well, but had low energy, and she had no depression and some anxiety at

times. *Id.* at 214. She was working at Rite-Aid and liked it. *Id.* Her mental status was within normal limits, Ms. Lieder found that Plaintiff's condition was stable, and she continued her on Lamictal. *Id.* at 214-215. Ms. Lieder's notes from April 23, 2009 indicated that Plaintiff was working, sleeping well and feeling okay on Lamictal. *Id.* at 210.

Nurse Lieder's July 27, 2009 progress notes indicated that Plaintiff was sleeping well, and her appetite and energy were good. ECF Dkt. #10 at 259. Plaintiff was working temporarily at the hospital and enjoying it. *Id.* Nurse Lieder found that Plaintiff's mental status was within normal limits and she rated the severity of Plaintiff's illness as "[m]oderately ill." *Id.* at 261.

On October 27, 2009, Nurse Lieder's progress notes reported that Plaintiff was sleeping well, her appetite was good, and her energy was not bad. ECF Dkt. #10 at 257. Plaintiff was applying everywhere for a job and had trouble sitting at home. *Id.* Nurse Lieder found that Plaintiff's mental status was within normal limits, except that she was anxious about not working. *Id.* She checked that Plaintiff's illness severity was "[m]oderately ill" and increased Plaintiff's Lamictal. *Id.* at 258.

January 26, 2010 progress notes from Nurse Longo at Pathways indicated that Plaintiff reported feeling good and had good energy, sleep and appetite. ECF Dkt. #10 at 255. Her relationship with her boyfriend was reported as good and she thought that the medications were working. *Id.* Nurse Longo found that Plaintiff's mental status was within normal limits and she rated Plaintiff's illness severity as "[m]oderately ill" and continued medications. *Id.* at 256.

Pathways progress notes from May 7, 2010 indicated that Plaintiff reported feeling good and had a stable mood, and was working full-time and doing well. ECF Dkt. #10 at 253. Nurse Longo found that Plaintiff's mental status was within normal limits and she rated the severity of Plaintiff's illness as "[m]oderately ill" and continued her medications. *Id.* at 254.

September 3, 2010 progress notes from Dr. Brar at Pathways indicated that Plaintiff's mental status was within normal limits and the severity of her illness was checked as "[n]ormal, not at all ill." ECF Dkt. #10 at 251-252. Dr. Brar indicated a change of diagnosis and wrote that Plaintiff "has no bipolar disorder she is depressed." *Id.* at 252. Dr. Brar changed the diagnosis to Major Depressive Disorder and continued Plaintiff's medications. *Id.*

November 11, 2010 progress notes from Dr. Abraham at Pathways indicated that Plaintiff was doing well and never started the Lexapro prescribed for her as she was satisfied with her response on Lamictal. ECF Dkt. #10 at 249. She rarely used the Ativan prescribed for her and had no acute complaints or side effects. *Id.* Dr. Abraham checked the severity of Plaintiff's illness as "[b]orderline mentally ill." *Id.* at 250.

May 9, 2011 progress notes from Dr. Abraham at Pathways indicated that Plaintiff was satisfied with how she was doing and was stable on her medications. ECF Dkt. #10 at 247. She described an ongoing benefit on Lamictal and was not using Ativan. *Id.* She was considering returning to school for phlebotomy. *Id.*

The psychiatric progress notes of Dr. Abraham from Pathways dated July of 2011 indicated that Plaintiff had increasingly racing thoughts, agitation and a severe panic attack. ECF Dkt. #10 at 245. She continued to look for work and did not use the Lorazepam prescribed for her. *Id.* Dr. Abraham prescribed medications. *Id.* at 246.

Nurse Murtaugh's note from Pathways on September 29, 2011 indicated that Plaintiff reported well on Lamictal and she did not start Lithium that was previously prescribed. ECF Dkt. #10 at 243. Plaintiff reported that she had stability in functioning and her racing thoughts and agitation had mostly subsided. *Id.* She was frustrated because she was trying to find a job. *Id.*

Psychiatric progress notes from Dr. Abraham at Pathways indicated on January 27, 2012, Plaintiff presented and was pleased about finding a job and was hoping that it would turn into full-time work. ECF Dkt. #10 at 241. She reported some anxiety and he found her to be euthymic and expressive. *Id.* He continued her medications of Lamictal and Lorazepam. *Id.* at 242. On April 25, 2012, Plaintiff reported to Dr. Abraham that she was doing well and her medications were working well. *Id.* at 239, 288. She was struggling to find work. *Id.* Dr. Abraham continued Plaintiff's Lamictal and Lorazepam and added Risperdal as needed. *Id.* at 240. On September 13, 2012, Plaintiff presented to Dr. Abraham as stable and she reported that she had used only a few Lorazepam and she found that Risperdal kept her calm but it was too sedating. ECF Dkt. #10 at 237, 280-281. She was frustrated with another job loss. *Id.* Dr. Abraham continued the Risperdal and Lamictal, and prescribed Ativan. *Id.* at 238. Dr. Abraham's notes indicated that on February 27,

2013, Plaintiff was frustrated that she could not keep a job, although she reported that she had been working for a pharmacy for the past three months. ECF Dkt. #10 at 235. She reported that she rarely used the Risperdal that was prescribed, but when she did it was useful. *Id.*

On May 22, 2013, Specialized Nurse Christy[4] of Beacon Health, the later name for Pathways, met with Plaintiff and indicated that Plaintiff was working as a cashier but lost her job on April 27, 2013, which was the sixth job that she lost in a year. ECF Dkt. #10 at 324. She found Plaintiff's affect to be labile and Plaintiff reported that the Risperdal slowed her down too much and she was agitated with others because they could do things that she could not. *Id.* Plaintiff agreed to try to take ½ of the Risperdal in the morning and the other half at night. *Id.* Nurse Christy did not complete the mental status findings portion of the progress note, except to note that Plaintiff denied suicidal/homicidal ideations. *Id.* She checked Plaintiff's illness severity as "[m]arkedly ill," and continued Plaintiff's medications.

On May 22, 2013, Nurse Christy completed a medical source statement for Plaintiff which Dr. Paul co-signed. ECF Dkt. #10 at 322-324. They opined that Plaintiff could frequently: follow work rules; use judgment; maintain regular attendance and punctuality; interact with supervisors; socialize; behave in an emotionally stable manner; relate predictable in social situations; manage funds and schedules; and leave home on her own. *Id.* They further opined that Plaintiff could constantly maintain her appearance and occasionally relate to co-workers and understand, remember and execute simple job instructions. *Id.* They opined that Plaintiff could rarely: maintain concentration and attention for extended periods of two hour segments; respond appropriately to changes in routine settings; deal with the public; function independently without redirection; work with or near others without being distracting; deal with work stress; complete a normal workday and workweek without interruption from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; understand, remember and execute complex job instructions; and understand, remember and execute detailed, but not complex, job

---

[4] As Defendant points out, Plaintiff's counsel acknowledged at the ALJ hearing that the first time that Nurse Christy evaluated Plaintiff was on May 22, 2013, although Plaintiff had been treating at Pathways for years prior to this time. ECF Dkt. #10 at 54-56.

instructions. *Id.* As the diagnosis supporting this assessment, Nurse Christy and Dr. Paul indicated major depressive affective disorder. *Id.* at 323.

On June 20, 2013, Nurse Christy's progress notes indicated that Plaintiff's father was ill and Plaintiff was upset over it. ECF Dkt. #10 at 336, 419. As to mental status findings, Nurse Christy merely indicated that there was no change. *Id.* She marked Plaintiff's illness severity as "[m]arkedly ill," and continued Plaintiff's medications. *Id.* at 337.

The July 18, 2013 progress notes of Nurse Christy indicated that Plaintiff was handling her father's illness better. ECF Dkt. #10 at 417. Nurse Christy indicated no change in Plaintiff's mental status and she marked the severity of Plaintiff's illness as "[m]arkedly ill," and continued her medications. *Id.* at 418.

Nurse Christy's September 3, 2013 progress notes indicated that Plaintiff's father was in the hospital and Plaintiff was able to sleep but was worried about her father. ECF Dkt. #10 at 413. Nurse Christy indicated no change in Plaintiff's mental status and she marked the severity of Plaintiff's illness as "[m]arkedly ill," and continued her medications. *Id.*

The October 14, 2013 progress notes of Nurse Christy indicated that Plaintiff reported being stressed as her father was still in the hospital and Plaintiff lost her unemployment case. ECF Dkt. #10 at 431. Nurse Christy indicated no change in Plaintiff's mental status and she marked the severity of Plaintiff's illness as "[m]arkedly ill," and continued her medications. *Id.* at 432.

Nurse Christy's December 11, 2013 progress notes indicated that Plaintiff's father was still in the hospital and Plaintiff had lost her unemployment compensation case. ECF Dkt. #10 at 427. Nurse Christy indicated no change in Plaintiff's mental status and she marked the severity of Plaintiff's illness as "[m]arkedly ill," and continued her medications. *Id.* at 427-428.

April 16, 2014 progress notes by Nurse Christy reported no change in Plaintiff's mental status and Nurse Christy indicated that the severity of Plaintiff's illness was "[m]oderately ill," and she continued Plaintiff's medications. ECF Dkt. #10 at 474-475.

Progress notes of Nurse Christy dated May 9, 2014 indicated that Plaintiff had gotten engaged. ECF Dkt. #10 at 471. Nurse Christy indicated no change in Plaintiff's mental status and

she marked the severity of Plaintiff's illness as "[m]arkedly ill," and continued her medications. *Id.* at 471.

On September 30, 2014, Nurse Christy's progress note indicated that Plaintiff reported doing okay and Celexa was working and she wished to continue with it, although it caused her some side effects. ECF Dkt. #10 at 479. Nurse Christy checked that all of the findings concerning Plaintiff's mental status were within normal limits, but she marked that the severity of Plaintiff's illness was "[m]arkedly ill." *Id.* at 479-480. She continued Plaintiff's medications. *Id.* at 480.

Also on September 30, 2014, Nurse Christy completed a medical source statement in which she opined that Plaintiff could constantly maintain appearance and socialize, and she could frequently follow work rules, use judgment, maintain regular attendance and punctuality, relate to co-workers, and understand, remember and execute simple job instructions. ECF Dkt. #10 at 477-478. Nurse Christy further opined that Plaintiff could occasionally function independently without redirection, behave in an emotionally stable manner, relate predictably in social situations, and leave her house on her own. *Id.* Nurse Christy also opined that Plaintiff could rarely: maintain concentration and attention for extended periods of two hour segments; respond appropriately to changes in routine settings; deal with the public; interact with supervisors; work with or near others without being distracted or distracting; deal with work stress; complete a normal workday and workweek without interruption from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; understand, remember and execute complex job instructions; understand, remember and execute detailed, but not complex, job instructions; and manage funds or schedules. *Id.* As the diagnosis supporting this assessment, Nurse Christy indicated major depressive affective disorder. *Id.* at 323.

The ALJ in this case addressed the medical source statements of Dr. Paul and Nurse Christy. ECF Dkt. #10 at 26. Plaintiff asserts that the ALJ failed to acknowledge that Dr. Paul was a doctor, the ALJ failed to give good reasons for rejecting the medical opinions, she compared the treating source opinions against the opinions of agency consulting sources, and substantial evidence supported the statements of Dr. Paul and Nurse Christy. ECF Dkt. #13 at 14-17.

The Court finds that the ALJ did not designate Dr. Paul as a doctor in her decision. ECF Dkt. #10 at 26. However, as Defendant points out, the ALJ was aware that Dr. Paul was a doctor as a discussion was had at the ALJ hearing about whether Dr. Paul co-signed the medical source statement or whether someone signed Dr. Paul's name. *Id.* at 54. The ALJ found the signature of Dr. Paul troubling as it did not have her D.O. designation after her name, but rather had "squiggly lines," which the ALJ interpreted as a perfunctory signature or that someone else signed Dr. Paul's name to the statement. *Id*. at 55. Moreover, as Plaintiff's counsel pointed out at the hearing, the first time that Dr. Paul and Nurse Christy examined Plaintiff was the same day that they issued the medical source statement. *Id*. at 55-56. This raises an issue as to whether Dr. Paul was a treating physician. In any event, the Court finds that the ALJ was indeed aware that Dr. Paul was a physician and was mainly concerned as to whether Dr. Paul actually signed the medical source statement.

The Court agrees with Plaintiff that the daily living activities cited by the ALJ in support of the treatment of the medical source statements by Dr. Paul and Nurse Christy are insufficient to support her decision to afford little weight to their opinions. The ALJ cited to Plaintiff's ability to drive and to manage finances as inconsistent with the work-related restrictions opined by Dr. Paul and Nurse Christy. ECF Dkt. #10 at 26. These activities are not inconsistent with the limitations. The ALJ also previously cited to Plaintiff's activities of vacuuming, preparing meals, grocery shopping, and going outside. *Id*. at 24. "Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." *Smith v. Califano*, 637 F.2d 968, 971 (3rd Cir. 1981). Sporadic or transitory activity does not disprove disability. *Id*. The Court finds that these relatively minimal activities reported by Plaintiff do not constitute substantial evidence to support the ALJ's decision to afford less than controlling weight and in fact only little weight to the opinions of Dr. Paul and Nurse Christy.

While the Court finds that the ALJ's citation to Plaintiff's daily living activities does not constitute a good reason for affording less than controlling weight and only little weight to the medical source statements of Dr. Paul and Nurse Christy, the ALJ did provide sufficient articulation of other record evidence that supports her treatment of the opinions. For instance, the ALJ cited to

progress notes showing that Plaintiff's medications were effective and her symptoms were stable and improving. ECF Dkt. #10 at 24, citing ECF Dkt. #10 at 216, 237. The ALJ also cited to the consultative examination in which Plaintiff was found to have appropriate judgment and insight, and an appropriate mood and affect. ECF Dkt. #10 at 24, citing ECF Dkt. #10 at 320-321. She also cited to treating counselor findings that Plaintiff had mental status examinations that were within normal limits, such as on September of 2014. ECF Dkt. #10 at 24, 26, citing ECF Dkt. #10 at 479-480. In fact, most of the psychiatric progress notes indicated normal mental status findings, despite a "markedly ill" designation on some of the notes. ECF Dkt. #10 at 389, 391, 393, 395, 397, 400, 403, 405, 409, 441.

For the above reasons, the Court finds that the ALJ properly afforded less than controlling weight to the opinions of Dr. Paul and Specialized Nurse Christy and substantial evidence supports the ALJ's decision to do so.

## VI.     CONCLUSION

For the foregoing reasons, the Court AFFIRMS the ALJ's decision and DISMISSES Plaintiff's complaint in its entirety WITH PREJUDICE.

Date: September 26, 2017          */s/George J. Limbert*
                                  GEORGE J. LIMBERT
                                  UNITED STATES MAGISTRATE JUDGE